UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERT MICHAEL MARTIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:15-cv-01062-JMS-DKL |
| ) | |
| BENSON Lt., ) | |
| *et al.* ) | |
| Defendants. ) | |

**Entry Discussing Motion for Summary Judgment**

Plaintiff Robert Michael Martin, an inmate at the New Castle Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983 alleging that while he was a pretrial detainee at the Hamilton County Jail (the Jail), defendant Jail Officials Lt. Benson, Sgt. Hoggard, Sgt. Lacey, Officer Carroll, and Officer Scherer failed to protect him from being assaulted by his cellmate in violation of his civil rights. Martin also asserts a state law negligence claim based on these allegations. The defendants have moved for summary judgment and the plaintiff has responded. For the following reasons, the motion for summary judgment [dkt 48] is **granted in part and denied in part**.

**I. Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light

most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II. Facts

Martin's claims center on his booking and classification at the Jail, his expressed fear that he was at risk of assault because of the charges against him, the classification of his cellmate and assailant Shawn Williams, and the alleged actions and inactions of the defendants in monitoring his cell at the time of the assault.

A. *Martin's Booking into the Jail*

Martin was booked into the Jail on or about September 14, 2013, after being charged with rape. When an inmate is booked, the Jail uses a computer generated classification questionnaire to determine whether an inmate will be classified as minimum, medium, or maximum. The goal of the classification system is to provide for the safety and protection of all Jail detainees and inmates by "housing like kind offenders together to the extent possible." To complete the classification questionnaire, information relating to a detainee's criminal history is obtained from a national database and a state database, as well as from a fingerprint return. Questions are also answered regarding whether there are any holds for the inmate, the inmate's disciplinary history (with the focus being on when given incidents occurred, whether a pattern exists, and whether the inmate

was sanctioned) and the inmate's residency. After the initial classification is completed, the initial classification determination is reviewed as soon as possible. Because he was booked on a B felony rape charge, Martin was classified as "high medium."

### B. *Martin's Placement in and Removal from Protective Custody*

Soon after he was booked into the Jail, Martin was placed in protective custody after he mistakenly told one of his cellmates (inmate Kercsmer) that he was accused of a sex crime, the cellmate provided this information to multiple other inmates, and Martin was allegedly threatened by other inmates while he was in the Jail's day room. Martin was placed in protective custody because he believed he was in danger due to his having told Kercsmer about his being charged with a sex crime.

On September 20, 2013, Martin was removed from protective custody by defendant Sgt. Debra Hoggard. The parties dispute whether Martin requested to be removed from protective custody. The defendants assert that inmates are removed from protective custody only upon request while Martin states that he was taken out of protective custody "under duress." Martin does not elaborate on the meaning of "under duress," except to that he "felt unsafe being in the general population." Martin also states that when he was removed from protective custody, Sgt. Hoggard told him to "lie about [his] charges or learn to fight." This is the only alleged interaction between Sgt. Hoggard and Martin.

After he was removed from protective custody, Martin was moved from cell block D to cell C-3 in cell block C.

3

C. *Martin's Fear of Assault*

The parties dispute whether Martin expressed his fear of assault to the defendants. According to Martin, before he was assaulted on October 2, 2013, he spoke with Sgt. Lacey and informed her that "he was in fear of being attacked by the next person the Jail put in the cell with him." Martin told Sgt. Lacey that problems would be prevented if she would move inmate Ronnie Lemon, who had similar charges pending against him and was Martin's friend, into Martin's cell. Sgt. Lacey responded by telling him that he would deal with whoever she put in his cell, that the Jail cannot move friends in together, and that he should not be a cry baby and should grow up. Sgt. Lacey asserts that she does not remember any interactions with Martin.

D. *The Placement of Williams with Martin and the Assault*

On October 2, 2013, Shawn Williams entered the Jail on a Community Corrections hold related to a non-violent D felony auto case. Book-In Sergeant Stinson classified Williams as high medium because he had a prior charge involving violence. Williams did not have any other holds and the disciplinary history information which was then available to Sgt. Stinson on the Jail's computer system did not show that Williams had been sanctioned by the Disciplinary Hearing Board for a violent offense. While the computer records did not reflect it, Williams did have a previous history of violence at the Jail. Approximately four years before the incidents in this case, Williams was involved in three fights at the Jail. Although the incident reports indicate that Williams and other inmates were sent to the Disciplinary Hearing Board following these 2009 incidents, the reports do not indicate what if any findings were made.

The night Williams entered the Jail, between 8:30 p.m. and 9:00 p.m., Sgt. Lacey placed Williams in Martin's cell. Sgt. Lacey was not familiar with Martin or Williams before the assault.

4

She did not know the charges pending against Martin and she does not recall any conversations she may have had with Williams or with the other officers about Martin before the assault. She also does not recall taking any action that involved placing Williams and Martin together in a cell, and she was not aware of Williams having previously been involved in a violent incident prior to his assault of Martin.

E. *The Assault on Martin*

After Williams entered Martin's cell, the two introduced themselves and "there was no problem" until around 12:30 to 1:00 a.m. when Williams covered the two-way call box in their cell with deodorant stickers and covered the cell door window with toilet paper. Approximately ten minutes later, Williams climbed up onto his top bunk and began a conversation with Martin during which he asked Martin if he knew how to fight and told Martin that he loved to fight.

Martin and Williams spoke for approximately twenty minutes after Williams covered the cell call button and cell door window. After their conversation, Williams, who had removed his clothing, then climbed down from his bunk and sexually assaulted Martin for what Martin estimates was approximately twenty to thirty minutes.

F. *Guard Tours*

Jail officers are required to conduct guard tours where they walk by every cell, "look[ing] in and mak[ing] sure everybody's okay" and pressing a button to show they were there. At the time of the incident in this case the defendants contend that Jail officers conducted guard tours once per hour between midnight and 4:00 or 4:30 a.m.

There is a dispute of fact regarding how often guard tours were conducted the night of the assault. Martin testified that the officers conducted one security check around 11:00 that night and

5

then passed out razors before midnight and did not come through the block again until after the attack, around 3:50 in the morning. The defendants submit evidence that it is their practice and directive to perform checks approximately every hour and they therefore did so that night.[1] Since the Court cannot weigh the evidence on summary judgment, there remains a genuine issue of fact regarding whether the defendants performed routine checks between midnight and 3:50 a.m. the night of the attack.

      G.     *The Other Defendants' Interactions with Martin*

In support of his claims Martin alleges direct interactions only with Sgt. Lacey and Officer Hoggard, but he brings claims against a number of other Jail officers. Their roles are discussed below.

          1.     <u>Sgt. Hoggard</u>

At the time of the assault, Sgt. Hoggard was assigned to day shift and therefore was off duty and not present at the Jail. She has no knowledge regarding the placement of Martin and Williams in the same cell. While Sgt. Hoggard was a Jail employee in 2009 and has a general recollection of Williams, including his "bad habit" of not wearing a shirt, she does not recall his doing anything violent or sexually harassing other inmates.

---

[1] The defendants also argue that Martin's own testimony regarding the time lapse between guard tours is inconsistent and suggest that it therefore should not be credited. *See* Exhibit 10 to R. Martin Deposition (dkt 49-1) (guard tours were not performed for "at least 3 hours" in C block); Exhibit 9 to R. Martin Deposition (guard tours were not performed for three (3) to four (4) hours); R. Martin Deposition p. 105, lns. 20-25; 106, lns. 1-25 (a guard tour was performed at 11:00 p.m., Jail officers passed out razors thirty (30) minutes later, and the guards did not come by his cell again until approximately 3:50 a.m. when Officer Scherer found Martin's note (i.e., a guard tour was not performed for over four (4) hours)). But each of these statements of the lapse between guard tours is similar, estimating that guard tours were not performed for 3-4 hours. Any slight discrepancy in testimony that is meant to be an estimate is insufficient to require a finding that the testimony is incredible at the summary judgment stage.

### 2. Lt. Benson

Lt. Benson served in a supervisory role at the Jail at the time Martin was assaulted. He had no involvement in classifying Martin, no involvement in classifying Williams before he was placed in Martin's cell, and no involvement in the guard tours that night. Prior to the assault, Lt. Benson did not know who Martin or Williams were and although he had apparently dealt with both individuals in some fashion when they were previously incarcerated at the Jail he does not have a specific recollection of any prior interactions with them.

### 3. Officer Carroll

Officer Kirstin Carroll did not know Martin and had no contact with him prior to the assault, she does not remember any conversations with Martin or Williams, she had not heard anything from other officers about Martin or Williams before the incident, and she was not aware of the charges against Martin at the time he was assaulted. On the night that Martin was assaulted, Officer Carroll was in the midst of conducting a guard tour, although not of C block, when Officer Scherer, conducting a guard tour of C block, walked out of C block where Martin and Williams' cell was located.

### 4. Officer Sherer

On the night of the assault, Officer Scherer discovered a note from Martin indicating that he had been assaulted. However, he did not see anything covering Martin's cell door window and he did not notice anything out of the ordinary prior to finding the note. Officer Scherer also was not familiar with Martin or Williams at the time that he found Martin's note, he did not know Martin's charges, and he was not involved in any decision to move either Martin or Williams from one cell to another prior to the incident. Once he read Martin's note, he took steps to assist him.

### III. Discussion

The defendants move for summary judgment on Martin's deliberate indifference and negligence claims.

A. *Deliberate Indifference*

Jail officials have a duty to protect detainees "'from violence at the hand of other inmates.'" *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008) (quoting *Borello v. Allison,* 446 F.3d 742, 747 (7th Cir. 2006)). But a jail officer can be held liable for failure to protect an inmate only if the officer knew the inmate faced a "'substantial risk of serious harm'" and "'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Id.* A claim that a jail official was deliberately indifferent to such a risk therefore has both an objective and a subjective component. First, the harm to which the prisoner was exposed must be an objectively serious one. *See Gevas v. McLaughlin*, 798 F.3d 475, 475 (7th Cir. 2015); *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) ("a beating suffered at the hands of a follow detainee ... clearly constitutes serious harm"). Next, the subjective prong of the deliberate indifference claim "requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Gervas,* 798 F.3d at 481 (quoting *Farmer*, 511 U.S. at 837). In addition to knowing that the inmate faced a substantial risk of serious harm, an official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847; s*ee also Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

The defendants argue that, contrary to Martin's assertions, they were not deliberately indifferent to Martin's safety by placing Williams in a cell with him when Williams had displayed violent tendencies in the past, by failing to conduct regular guard tours, and by ignoring Martin's requests for help. Some of the defendants also argue that they were not sufficiently personally involved in the acts at issue to be held liable.

1. Williams' Classification and Placement with Martin

Martin bases his deliberate indifference claim in part on the assertion that Williams was improperly classified because he had a history of violence in that he had previously been involved in fights at the Jail. Because of his history of violence, Martin asserts that Williams never should have been housed with him.

When Williams was moved into Martin's cell, he had been classified by Sgt. Stinson (who is not a party to this case), like Martin, as "high medium." There is no evidence that this classification, at the time it was made, was incorrect. Aside from the Community Corrections hold involving a non-violent charge, Williams did not have any other holds pending and the disciplinary history information which was then available to Sgt. Stinson did not show that Williams had been sanctioned by the Disciplinary Hearing Board for a violent offense. Further, none of the defendants were involved in classifying Martin or Williams and there is no evidence that the defendants were familiar with Williams or with any previous history of violence on his part.

Martin advocates that at least defendants Sgt. Hoggard and Lacey were aware that Williams might be violent, but the evidence he presents does not support this assertion. Martin points out that Sgt. Hoggard, who has worked at the Jail for much of the same time as Sgt. Lacey, stated that she was familiar with Williams from previous times he was incarcerated at the Jail. But Sgt.

9

Hoggard's testimony is that her only recollection of Williams was that he had a "bad habit" of not wearing a shirt. Martin argues that this testimony suggests that both Sgts. Lacey and Hoggard were aware that Williams had violent tendencies. But this evidence shows only what Sgt. Hoggard stated – that she remembered that Williams sometimes did not wear a shirt. It is not a reasonable inference from this evidence that Sgt. Lacey remembered Williams at all or that either Sgt. Lacey or Hoggard were aware that Williams had violent tendencies. Martin also states that Sgt. Hoggard removed him from protective custody "under duress" and told him to lie about his charges or learn to fight, but Martin presents no evidence that Sgt. Hoggard knew that other inmates, particularly Williams, would become aware of the charges against Martin and assault him because of those charges.

In short, there is no evidence that the defendants were aware at the time Williams was placed in Martin's cell that Williams would pose a risk of harm to Martin sufficient to succeed on a deliberate indifference claim against them. *See Washington v. LaPorte Coutry Sheriff's Dep't.*, 306 F.3d 515, 518 (7th Cir. 2002) ("To demonstrate 'deliberate indifference,' Washington must show actual knowledge by the officials and guards of the existence of the substantial risk and that the officials had considered the possibility that the risk could cause serious harm.").

### 2. Monitoring of Martin's Cell

Next, according to Martin, the defendants were also deliberately indifferent by failing to adequately monitor the cell he shared with Williams. The parties dispute the extent to which the cell was monitored on the night of the assault. The defendants assert that guard tours, which involve checking every cell, take place as a matter of course and would have taken place that night. On the other hand, Martin contends that several hours passed between guard tours that night and

10

that at least 30 to 40 minutes passed between the time that Williams covered the cell window and officers discovered this fact.

Even if the defendants failed to conduct guard tours as Martin claims, however, this failure does not rise to the level of deliberate indifference. As the Seventh Circuit explained in *Brown v. Budz*,

> typical deliberate indifference claims assert that a defendant-custodian failed to take protective action after a plaintiff-detainee complained of a feared threat posed by rival gang members or a specific person. *See, e.g., Butera v. Cottey,* 285 F.3d 601 (7th Cir.2002); *Lewis v. Richards,* 107 F.3d 549 (7th Cir.1997); *Haley v. Gross,* 86 F.3d 630 (7th Cir.1996); *Jelinek v. Greer,* 90 F.3d 242 (7th Cir.1996). Another common fact pattern found in our failure to protect cases finds deliberate indifference arising out of improper cell assignments, where the defendant custodian places an unwitting detainee in a cell with another detainee whom the custodian knows to have certain violent propensities. *See, e.g., Weiss v. Cooley,* 230 F.3d 1027 (7th Cir.2000); *Billman v. Ind. Dept. of Corr.,* 56 F.3d 785 (7th Cir.1995); *Zarnes v. Rhodes,* 64 F.3d 285 (7th Cir.1995). In these types of cases, the victim and assailant are readily identifiable, and the custodian's deliberate indifference is based upon knowledge of a clearly particularized risk.

398 F.3d 904, 914-15 (7th Cir. 2005). As already discussed, there is no evidence that the defendants here were aware of any specific threat posed to Martin by Williams and Martin's generalized statements regarding his fears are insufficient to create knowledge of a specific threat. Without knowledge of a specific threat to Martin, the failure to conduct guard tours for, at most, four hours, is insufficient to rise to the level of deliberate indifference.

### 3. Martin's Fear for his Safety

Martin also argues that the defendants were deliberately indifferent to his safety by ignoring his expressed concerns. Martin told Sgt. Lacey that he was in fear of being attacked because the Jail kept giving him new cellmates for short period of time. But complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an

11

inference that a prison official had actual knowledge that the prisoner was in danger. *See, e.g., Dale v. Poston,* 548 F.3d 563, 569 (7th Cir. 2008) ("[The prisoner's] vague statement that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play."); *Klebanowski v. Sheahan,* 540 F.3d 633, 639–40 (7th Cir. 2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was threatening him or what the threats were); *Grieveson v. Anderson,* 538 F.3d 763, 776 (7th Cir. 2008) (prisoner did not mention to guards that he was perceived to be a "snitch" or otherwise apprise them of a specific threat to his life); *Butera v. Cottey,* 285 F.3d 601, 606 (7th Cir.2002) (prisoner only stated vaguely that he was "having problems" in his cellblock and "needed to be removed"). While there is some evidence that Martin expressed safety concerns, there is no evidence that Sgt. Lacey was aware of a specific threat from a specific source that would be sufficient to support a finding that the defendants were deliberately indifferent to his safety.

Martin argues that Sgt. Hoggard was deliberately indifferent to his safety because she removed him from protective custody despite fear for his safety. Martin has presented evidence that Sgt. Hoggard removed him from protective custody "under duress" and told him to "lie about [his] charges or learn to fight." Based on this evidence, a reasonable jury could conclude that Martin expressed a specific concern to Sgt. Hoggard that he might be subject to assault based on his charges and she acknowledged the validity of, but ignored this concern. **Sgt. Hoggard therefore is not entitled to summary judgment on Martin's deliberate indifference claim**.

### 4. Personal Involvement

Finally, the defendants argue that they are entitled to summary judgment because they were not personally involved in the acts leading up to the assault on Martin. A defendant can only be

12

liable for the actions or omissions in which he personally participated. *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).

To the extent that Martin's deliberate indifference claim against Sgt. Lacey is based on his allegation that she told Williams that Martin was in Jail for a sex offense, this evidence is excluded as inadmissible hearsay.[2]

Next, Lt. Benson argues that, while he served in a supervisory role at the time of the assault on Martin, he had little familiarity with Martin and Williams, no involvement in classifying Martin or Williams, and no involvement in the guard tours. Lt. Benson's supervisory role is insufficient

---

[2] Martin states that before the assault, he had told Williams that he was in the Jail for drug charges, but "after being threatened and told that Sergeant Lacey disclosed that I was a child rapist to him, I told him about the charges." Sgt. Lacey seeks exclusion of this statement, arguing that it is inadmissible hearsay and Martin argues that this statement is admissible because goes to Williams's state of mind, not the truth of the matter asserted. A similar hearsay objection was raised in *Park v. City of Carmel*, 99 F.Supp. 872 (S.D. Ind. 2015). In that case, plaintiff Greg Park, a former Carmel Police Officer, sought employment as a Court Security Officer at the Federal Courthouse in Indianapolis. He sued the City of Carmel for retaliation based on information provided by Carmel during the background check for that position. In support of his claims, Park sought to present evidence of statements by the Judicial Security Inspector (JSI) who reviewed Park's application regarding his communications with Carmel. *Id.* at 875. Park relied on these statements as evidence to show how Carmel was handling the JSI's request for Mr. Park's personnel file. *Id.* The Court sustained Carmel's objection to this evidence finding that it was submitted to show the truth of the matters asserted in the statements. *Id.* In other words, statements by the JSI were used to show what Carmel told him. Similarly, here, the statement presented by Martin – that Williams said that Sgt. Lacey told Williams about the nature of the charges against him – are intended to show the truth of the matter asserted. Martin's deliberate indifference claim against Sgt. Lacey depends in part on the assertion that Sgt. Lacey shared information about Martin's charges resulting in a greater risk that Martin would be assaulted. Martin argues that this evidence is not hearsay because it is meant to show Williams's state of mind at the time of the assault, but the import of this evidence is not that Williams suspected Martin to be in jail on rape charges, but that *Sgt. Lacey told him* that Martin was in Jail on rape charges. Because the evidence is presented to prove this fact, it is inadmissible hearsay.

13

to subject him to liability for deliberate indifference. *See Burks v. Raemisch,* 555 F.3d 592, 593-94 (7th Cir. 2009) ("Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise. . . . *Monell's* rule [is that] that public employees are responsible for their own misdeeds but not for anyone else's.") (citing *Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978)).

Finally, Officers Carroll and Scherer argue that they were not involved in classifying Martin or Williams. Martin argues that these defendants neglected to conduct regular guard tours and check the cell that housed Martin and Williams and that Scherer found the note that Martin wrote stating that he had been assaulted. The Court has already found that the failure to conduct guard tours did not rise to the level of deliberate indifference. The evidence also shows that Officer Scherer discovered a note left by Martin stating that he had been assaulted and that Officer Scherer then acted to assist Martin. This evidence clearly does not suggest deliberate indifference.

The Court has already found that a reasonable jury could find that Sgt. Hoggard was deliberately indifferent to Martin's safety. The reminaing defendants, Sgt. Lacey, Lt. Benson, and Officers Carroll and Scherer, however, have shown that they were not deliberately indifferent. These defendants are all entitled to summary judgment on Martin's Eighth Amendment claims.

  B. *Negligence*

The defendants also move for summary judgment on Martin's negligence claim arguing, among other things, that the defendants are immune from liability under the Indiana Tort Claims Act (ITCA). Under the ITCA, a "lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally."

Ind.Code § 34-13-3-5(b). The ITCA standard for scope of employment is broad: if an employee's conduct is of the same general nature as that authorized or incidental to the conduct authorized, it is within the scope of employment. *Wilson v. Isaacs,* 917 N.E.2d 1251, 1258 (Ind. Ct. App. 2009). Here, there is no evidence that the defendants, who were carrying out their duties at the Jail, acted outside the scope of their employment. Accordingly, they are entitled to immunity under the ITCA.

### IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment [dkt 48] is **granted in part and denied in part**. The motion is **granted** as to all claims against defendants Sgt. Lacey, Lt. Benson, and Officers Carroll and Scherer. The motion is **granted** as to the negligence claim against Sgt. Hoggard. Finally, the motion is **denied** as to the deliberate indifference claim against Sgt. Hoggard. These claims will be resolved either by settlement or trial. No partial final judgment shall issue as to the claims resolved in this Entry.

**IT IS SO ORDERED.**

Date: January 12, 2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

All electronically registered counsel